WILL OF DANIELS: STATE, Appellant, vs. DANIELS and others, Respondents.

*May 27—September 14, 1937.*

For the appellant there were briefs by the *Attorney General, L. E. Vaudreuil,* deputy attorney general, and *Neil Conway,* inheritance tax counsel, and oral argument by *Mr. Vaudreuil* and *Mr. Conway.*

For the respondents there were briefs by *Lines, Spooner & Quarles,* attorneys, and *Howard A. Hartman* and *W. J. McGowan* of counsel, all of Milwaukee, and oral argument by *Mr. Hartman.*

The following opinion was filed June 21, 1937:

MARTIN, J. There is little, if any, dispute as to the facts. The controversy arises with reference to the inferences and conclusions to be drawn from the facts established. This necessitates a full statement of the facts.

Dr. A. D. Daniels died testate May 7, 1931, at the age of seventy-seven years nine months and four days. He left surviving, his widow, Ella S. Daniels, aged sixty-four, and

his son, Joseph S. Daniels, aged forty. His last will and testament, dated November 5, 1925, was admitted to probate by the county court of Oneida county. His estate was appraised at $106,344.18. After payment of claims and probate expenses, the net value of the estate was $66,890.83. By his will, Dr. Daniels bequeathed $5,000 to Dr. C. A. Richards, a cousin; $2,500 to Alfred Chickering, his wife's nephew; and $10,000 to Ely D. Sterling, his wife's brother. He provided for the payment of $500 per month to his son, and of such sums to his wife as would enable her to live comfortably pending the settlement of his estate. The balance was devised and bequeathed in trust to pay from the income therefrom the sum of $15,000 per year to his wife, and $1,200 per year to Flora Chickering, his sister-in-law, said annuities to continue during the lives or until the remarriage of said persons, whereupon the trust as to each was to terminate, the balance of the income to be paid to the son, Joseph, during the term of the trust and, upon its expiration, the entire balance to go to said son. The trustees were authorized to encroach upon the corpus of the trust to the extent of $25,000 for needs of the widow.

Dr. Daniels was born in the state of Maine, August 11, 1853. He was graduated from the Detroit Medical School in 1876. He practiced his profession for a number of years at Winneconne and New London, then located at Rhinelander, and continued in practice there until April, 1910, at which time he discontinued the practice of medicine, devoting his entire time to his other business interests. He was a vice-president and director of the First National Bank of Rhinelander and of the Rhinelander Paper Company; the president of the Oneida Gas Company, which he organized and controlled; and he held the same office in the Daniels Manufacturing Company, which he organized and controlled. He had various other extensive real estate, timber, and lumber interests in Wisconsin, Minnesota, and the Pacific Northwest.

In January, 1928, he organized the A. D. Daniels Company under the laws of the state of Delaware as a holding company with authorized capital stock of $1,500,000, consisting of one thousand five hundred shares of the par value of $1,000 each. The organization meeting of this company was held in February of 1928. When this company was organized, Dr. Daniels transferred to it practically all of his assets in exchange for one thousand shares of its stock of the value of $1,000,000. One share of the stock was issued to his wife, and one share to his son, the remaining nine hundred ninety-eight shares to himself. The three stockholders became the directors. Dr. Daniels was elected president, his wife vice-president, and the son secretary and treasurer. In 1929, Ernest Draheim, who at that time and prior thereto was the private secretary of Dr. Daniels, became secretary of the holding company. Otherwise the officers of the holding company continued from its organization as indicated until Dr. Daniels' death. The books and records of the holding company were kept in the private office of the doctor. What he did in the management and operation of the holding company was not questioned by his wife or son.

In the company's ledger there was kept a record of the doctor's personal account which was posted from information furnished by him to the bookkeeper. The aggregate debts charged to Dr. Daniels for 1928 and 1929 amounted to $210,697.42, and he was credited with $141,855.26. From January 1, 1930, to April 20, 1931, the debit balance amounted to $90,000. On this latter date, approximately two and a half weeks before his death, and while he was ill, the account was balanced by the transfer of eighty-seven shares of A. D. Daniels stock to the company. As president of the holding company, he had a salary of $15,000 for the years 1928 and 1929. For the years 1930 and 1931, his salary as president was fixed at $10,000 per year. No salaries or compensation were paid to any of the other officers.

On April 24, 1928, Dr. Daniels executed on the certificate representing one hundred twenty-four shares of stock a formal assignment to his wife, and at the same time executed a formal assignment of the certificate representing seven hundred forty-nine shares to his son. Neither certificate had been removed from the stock book which had remained in the possession of the deceased. On March 19, 1929, he caused the certificates above mentioned to be canceled and new ones issued to his wife and son for like amounts. The certificate of the son was receipted for on the same date. The one issued to the wife was receipted for by Dr. Daniels. *These transfers constitute the gifts on which it is claimed a tax should be paid.*

Shortly following, in 1929, Dr. Daniels caused a mausoleum to be built upon a cemetery lot belonging to him at Neenah, Wisconsin. Checks amounting to $19,000 were drawn by the doctor on the account of the A. D. Daniels Company, payable to the contractor who built the mausoleum.

The last illness of the deceased began in the fall of 1930, with a severe cold followed by pyelitis and bronchial pneumonia, from which death followed on May 7, 1931.

During the period from 1915 to 1930, Dr. Daniels made gifts to his son, exclusive of the stock in question, and consisting principally of cash and corporate stocks, aggregating approximately $91,000. The Daniels Manufacturing Company, organized in 1915, owned and operated a paper-converting plant which was managed by the son. This company to a large extent was financed by Dr. Daniels. It appears that during the years 1924 and 1925, Dr. Daniels discussed with various persons the advisability of organizing a holding company within which to consolidate his different holdings.

Concerning Dr. Daniels, the trial court in its decision, said:

"The testimony pictures decedent as a man who appeared almost frail but was in fact tough and wiry; as a person

of optimistic nature and indomitable will, one of those individuals who in later life propose to wear out,—not rust out. In earlier life he had experienced three mild cerebral hemorrhages. Of the one in 1893 but little was shown; Mrs. Daniels thought it somewhat affected one of his limbs while to Dr. Richards no residual was apparent. In 1900 he was confined to his home less than a week and in 1903 was confined to his hotel three or four days, recovery in each case leaving no residual. In March, 1927, decedent suffered an attack of shingles (herpes zoster) which was described by the attending physician as being, in the amount of skin surface involved and pain suffered, one of the most severe cases of shingles he had encountered in thirty years of practice. The affected area covered the pectoral region, shoulders, neck and right side of the face and scalp, eventually so involving the nerves of the face as to temporarily cause a partial facial paralysis. Decedent was confined to his home most of the time for two or three weeks, being really ill about five weeks during which time he was greatly weakened, the pain continuing for two or three months, and it being a year to eighteen months before the facial paralysis had entirely disappeared. Within three or four weeks from the onset of the attack he began gradually to assume his usual business activities, at the end of six weeks was daily attending same, and thereafter slowly regained his strength. During his illness urinalysis findings were normal, there being no uremia or kidney trouble. His blood pressure reached 130/80, described as normal for a man of his years, and there was no cerebral hemorrhage."

Mr. Alex McRae, an old acquaintance of Dr. Daniels, testified that he frequently met the doctor on the street during the year 1927 or 1928; that the doctor walked rather feebly and with a cane. That on one occasion in 1928 he met him at the courthouse in Rhinelander. During this period Mr. McRae did not consider him a "well man." He did not observe the doctor using a cane at any time after 1928.

The executors offered considerable testimony bearing upon decedent's physical condition, conduct, business, and other activities, his mental outlook, etc., in 1928 and there-

after until his death. Of this testimony, the trial court said :

"Such evidence coming from his physician, secretary, business associates, bank officials, employees and others, and in effect establishing rather conclusively that during this period and until his last illness decedent's physical condition was substantially the same as prior to the 1927 illness, that his business and physical activities were as extensive as before, that he was at all times optimistic,—was making plans and commitments extending into future years, that the subject of death was at no time mentioned, and indicating that, as said by Dr. Richards, his condition in 1928 and 1929 would warrant a normal expectancy."

The doctor's last illness resulted from overexertion while preparing firewood in November, 1930. He contracted a severe cold and pneumonia developed. After partial recovery, he suffered a relapse, developed pus in the urine and urinary infection. There was no cerebral hemorrhage and the attending physician testified that the hemorrhages experienced in earlier life were not a contributory factor in his death. During the last illness his mind remained clear until within a few days preceding death.

The state contends that the deceased, following his illness in 1927 and motivated by the thought of death, caused to be organized the holding company referred to, so that he might transfer his estate through the distribution of the stock in the holding company to his beneficiaries and thereby save an inheritance tax. However, as is pointed out by the trial court in its decision, the evidence shows that the formation of the holding company in 1928 was the culmination of plans under contemplation for several years; that it was organized to facilitate financing; that as early as 1924 and 1925 decedent had on various occasions disclosed such purpose to Mr. Filter, a public accountant, Mr. Sterling, a brother-in-law, and to his son; that he had his attorney

working on such organization in 1925. The testimony shows that the idea of constructing a family mausoleum originated with Mrs. Daniels; that it was discussed by the family at different times from 1924 until it was built.

It further appears that the son had been closely associated with his father in the management of different enterprises, and had assisted him in deals involving extensive timber holdings in the west. In 1926, and on several occasions later, decedent discussed with his secretary, Mr. Draheim, the business affairs and plans for the future, including those relating to his son; he expressed his appreciation of his son's attentiveness,. and his desire to reward his son; that he "wanted to preclude any possibilities of his [son] becoming active elsewhere and away from the family itself;" and, referring to the stock which was later transferred, he stated "that they were going to get it any way and he would like for them to have it now and help me work on it and take a greater interest in the affairs I am connected with."

Mr. Filter testified that from 1927 to 1929 decedent spoke to him "right along" on this subject; that "his idea was to keep his son Joe at home. Joe had been out west on timber interests and a lot of other things and (decedent) talked to me frequently about getting Joe interested, that is to stay in Rhinelander and take charge, part charge any way, of his plants here;" and "he wanted his boy to be home with him here in Rhinelander. That was his big argument with me when speaking about it," and that decedent "asked his advice quite frequently—what he could do to get Joe interested in his business and spoke about it quite a lot."

It appears that in 1902 Dr. Daniels gave his wife one half the profits he made on the sale of a certain tract of cutover lands, the one half being approximately $6,000. This sum was thereafter invested for her by Dr. Daniels in western

timber and, as the timber was sold, the proceeds were reinvested in other timber; that no accounting had been made; and that, as her share of these transactions, the doctor in 1929 transferred to his wife the stock in question.

While no formal findings were made herein, the trial court in its decision makes a full analysis of all the facts, and it must be accorded the same consideration and weight as formal findings.

The statute here applicable, sec. 72.01 (3), provides:

"*Transfers in contemplation of death.* When the transfer is of property, made by a resident or by a nonresident when such nonresident's property is within this state, or within its jurisdiction, by deed, grant, bargain, sale or gift, made in contemplation of the death of the grantor, vendor or donor, or intended to take effect in possession or enjoyment at or after such death. Every transfer by deed, grant, bargain, sale or gift, made within two years prior to the death of the grantor, vendor or donor, of a material part of his estate, or in the nature of a final disposition or distribution thereof, and without an adequate valuable consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section."

The sole question is whether or not the transfers made by Dr. Daniels to his wife and son on March 19, 1929, of the corporate stock of the A. D. Daniels Company, were made by him in contemplation of death. This, of course, presents an issue of fact. The transfers having been made more than two years prior to Dr. Daniels' death, there is no presumption that they were made in contemplation of death. The state has the burden of proof and must establish the fact by evidence and inferences from the evidence, as distinguished from speculation and conjecture. *Creamery Package Mfg. Co. v. Industrial Comm.* 211 Wis. 326, 331, 248 N. W. 140; *Stock v. Kern,* 142 Wis. 219, 223, 125 N. W. 447.

The phrase "in contemplation of death," as used in the statute, must be distinguished from the ordinary expectation

of death which everyone entertains. In order that a gift be made "in contemplation of death," the thought of death must be the "impelling cause," the "inducing cause," the "controlling motive." *Will of Harnischfeger,* 208 Wis. 317, 328, 242 N. W. 153, 243 N. W. 453; *United States v. Wells,* 283 U. S. 102, 118, 51 Sup. Ct. 446. In the *Harnischfeger Case,* the gifts were made within two years prior to death; hence, under the statute, they were presumed to have been made in contemplation of death, and the burden of proof was upon the donees to establish that they were not so made. There, the trial court found that all of the gifts made by deceased within two years prior to his death were made in contemplation of death.

In the instant case, the trial court said:

"After a careful examination of the evidence presented I am of the opinion that the thought of death has not been shown to have been the impelling or inducing cause or the controlling motive of the transfers in question, but that same were prompted instead by the consideration just mentioned, and it must therefore be held that such transfers were not made in contemplation of death within the meaning of the statute."

In the *Wells Case,* the United States supreme court, at page 118, said:

"The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand.'"

We cannot disturb the findings of the trial court unless they are against the great weight and clear preponderance of the evidence. *Estate of Fish,* 214 Wis. 464, 466, 253 N. W. 387; *Zolandek v. First National Bank,* 212 Wis. 632, 634,

250 N. W. 391. In *Hamblyn v. Crase,* 194 Wis. 628, 631, 217 N. W. 311, the question litigated involved the intention of a grantor as to delivery of a deed. This court said:

"The county judge was in a better position to judge of the intent than is this court. There was credible evidence from which he could find either way, and in such a case we are bound by his findings of fact, unless the great preponderance of the evidence is to the contrary."

The trial court carefully weighed all the facts and circumstances surrounding the transfers of the stock in question. He heard and saw the several witnesses as to the physical and mental condition of Dr. Daniels, and as to the doctor's statement of his motive for making the transfers in question. The conclusion that they were not made in contemplation of death has ample support in the evidence.

*By the Court.*—Order affirmed.

FAIRCHILD, J. (*dissenting*). I must concede that no presumption existed before the admission of evidence to create a *prima facie* case in favor of the state, the gifts having been made six weeks too early to invoke the rule of presumption of a gift in contemplation of death. The burden of proof from the beginning in the case before us rested upon the state. I think this burden was met. A gift may be made in contemplation of death even though made two years and six weeks before as well as two years or· less before that final fact occurs. Such a gift may be made by a donor who is in perfect health and still cheerfully facing the future with faith and hope. Full influence must be accorded the decision of the trial court. That decision is in law controlling as to facts found unless against the great weight and clear preponderance of the evidence. My review of the evidence has resulted in the formation of a conclusion that the state has shown that in the thought of death entertained by Dr. Daniels lies the motive which prompted the making of the gifts at the

time and in the manner in which they were negotiated. This conclusion is supported by material and controlling facts established by evidence which to my mind more than satisfies the exacting rule which must be satisfied before findings of facts are to be disturbed on review here. The facts as detailed in the majority opinion must be relied on. It is my opinion that those facts show that the donor understood and that the donees understood that the gift was anticipating the final descent of what was eventually to be the donees.' The facts show that Dr. Daniels was to retain and did retain control of his property during his life. No practical purpose was served by making the gift at the time it was made any more than by building the mausoleum at the identical time except the one of having the estate escape the payment of an inheritance tax, the opinions of his neighbors and associates with respect to his expectation of living many more years, as testified to, to the contrary notwithstanding. It makes no difference in deciding a case of this kind how long the plan had been in the mind of the donor if the gift when made is not distinctly identified with life and its activities as distinguished from a contemplation of death. As a matter of fact, the plan of forming the corporation had been set down on paper in the form of a notice of incorporation in November, 1925, the same month in which deceased made his will. The incorporation was not, however, accomplished until later; when accomplished, the gift to Mrs. Daniels was approximately equal to the value of the annuity she would have received under the will, had the property remained in decedent's estate until his death. Decedent retained control of all affairs, appropriated as he saw fit the benefits incidental to ownership down to the time of his death. I am impressed with the similarity between this case and the case of *Estate of Ogden,* 209 Wis. 162, 244 N. W. 571, where we ruled that a tax was properly due the state. In the *Ogden Case,* the income from property given to a daughter was collected

by the donor, "considered as his property, and used by him as his own." In the case at bar, the donor continued to manage the affairs of the corporation which was the instrument through which he controlled his properties. All the circumstances attached to the transaction indicate clearly to me that a plan for distribution of his property after death was uppermost in the donor's mind and was the real purpose and the dominant motive in making the gift. I therefore respectfully dissent from the decision.

A motion for a rehearing was denied, without costs, on September 14, 1937.