**PROCTOR et al. v. HASSETT.**
Civil No. 1449.

District Court, D. Massachusetts.
July 28, 1943.

Edward C. Thayer and Rackemann, Sawyer & Brewster, all of Boston, Mass., for plaintiffs.

Edmund J. Brandon, U. S. Atty., and George F. Garrity, Asst. U. S. Atty., both of Boston, Mass., for defendant.

HEALEY, District Judge.

This is an action against Thomas B. Hassett, individually and as Collector of Internal Revenue for the District of Massachusetts, brought by Grace Hopkins Proctor and Henry Harrison Proctor, surviving executors of the will of Charles Anderson Proctor, deceased, to recover $126,704.57, with interest, on account of an alleged overpayment of estate taxes.

The decedent died on February 8, 1936, at Boston, Massachusetts, at the age of 69 years.

The decedent had always been a physically active man. As a young man, he had been a runner. In later years, his principal physical activities were golfing and curling, in both of which he engaged up to the time of his death. He was a regular and devoted follower of both of these sports.

He was married in 1907 to Grace Hopkins Proctor, one of the plaintiffs in this case. He was survived by his wife, a son, Henry Harrison Proctor, the other plaintiff, and two daughters, Barbara Thompson and Frances Proctor.

From the time of his marriage until 1917, the decedent never had any serious illness. He was an active partner in Proctor Ellison and Co., leather merchants in Boston. He was also a member of the Bar, but did not engage in the practice of law. In 1917, the business of Proctor Ellison and Co. was very active. In October of that year, he had a severe attack of dizziness accompanied by a certain amount of pain and pressure in his chest. As a result, he consulted three doctors. He was pronounced free from disease by Dr. Frederick Shattuck of Boston. Dr. Walton, a neurologist, diagnosed his condition as one of extreme nervous exhaustion, and advised complete rest away from home. At the same time, he also consulted Dr. George Sears, a heart specialist, who told him he had an athlete's heart, which meant it was slightly enlarged, but that, if he led a sensible life, he could forget his heart. He told him that it was the kind of a heart that any man his age who had been an athlete would have. The decedent spent the winter of 1917-1918 in South Carolina, and there was never a recurrence of his nervous symptoms of 1917. He decided to retire from Proctor Ellison and Co., and began to wind up his interest in 1918, and finally was out of the business in about two years.

During the early years of his marriage, he played golf as frequently as he could, and when he was unable to play golf, he took long walks with his wife.

In 1919, decedent and his wife established trusts for their children amounting to about $170,000 apiece. In 1924, decedent and his wife established further trusts for the children of about $180,000 apiece. The children were the income beneficiaries of these trusts. One half of the principal of the 1919 trusts was to be distributed to the children at the age of 30, and the other half at the age of 35. The principal of the 1924 trusts was not to be distributed to the children, but was to go to their issue. The children had no power of appointment over the principal of any of these trusts, nor were the income or principal of any of them assignable or capable of being anticipated or alienated in any manner by the beneficiaries. The trustees, Mr. and Mrs. Proctor, had the discretion of paying over the income of the trusts to the children or of allowing it to accumulate. Until decedent's death, the income of the 1919 trusts was all allowed to accumulate. From the 1924 trusts, the children received amounts sufficient to cover their education and allowances. At the time these trusts were established, decedent was in excellent health, and did not contemplate death. The decedent's purpose was to safeguard "the children's money", and he thought it was a good idea to divide up the family income. On October 16, 1931, and on May 28, 1932, decedent made gifts of an aggregate value of $135,018.58 to his wife. At that time he was apparently in good health, except for certain symptoms which will be described later. At that time, he did not contemplate death, and these gifts were not motivated by the thought of death.

In October of 1934, decedent took out two single premium $25,000 straight annuity policies, after careful study of the financial stability of the insurance companies issuing the policies. He explained to his wife that if one lived a long time one would win out by taking annuities. He told her that he came of a long-lived family and that he would live to be at least eighty.

In December of 1933 and in August of 1934, decedent took out combination annuity and insurance policies of a total value of $40,000.

In the late winter or early spring of 1935, decedent told his wife that he thought it would be a good idea for their daughter, Barbara, who had married a young surgeon with little prospect of any substantial income from his profession for some time, to have some money of her own which she could use as she saw fit, and she would then be in a position to help her husband in getting established in his profession. Decedent and his wife decided that both of them should contribute to the gifts. They also decided to make gifts to all of the children since they always treated the children equally. Decedent stated that the gifts would reduce his income tax, and that gift tax rates were liable to be raised. Decedent said nothing of the estate tax. It was decided to make each gift aggregate about $125,000 or $130,000, because they thought that would yield the amount of income each year that the children should have. In a conversation with his son, H. Harrison Proctor, about the end of July, 1935, the decedent stated that he and his wife had decided to give the children some property of their own. He said that the children had proved themselves responsible and that it was time they had something of their own,

that there were various reasons for making the gifts, that the gift tax was going to be higher the next year, that Frances would be of age in a few days and that he, the decedent, had more income than he needed and it would be much more sensible for the children to pay the income tax in the lower bracket than paying it himself. On August 8, 1935, decedent made gifts of the following values to the children:

Receipts for the gifts were signed by each of the children.

On the day that the gifts were made, decedent told the children that they had shown themselves to be responsible and he wanted them to have some money of their own. The securities included in the gifts were than transferred to a separate safe deposit box and the dividend checks and interest were deposited in a separate

| | Value at Time of Gift | Value at Date of Death |
|---|---|---|
| Henry Harrison Proctor | $116,662.50 | $140,018.75 |
| Barbara Proctor Thompson | 83,231.25 | 98,812.50 |
| Frances Ingersoll Proctor | 114,012.50 | 136,900.00 |
| Total | $313,906.25 | $375,731.25 |

The value of these gifts at the time they were made, namely, $313,906.25, represents approximately 15 percent of the value of the net estate owned by decedent at the time. He duly reported said gifts upon a Federal gift tax return and paid a gift tax upon such gifts in the amount of $19,068.75. Decedent's wife also made gifts to the children at the same time in the aggregate amount of $118,612.50. At the time of these gifts, decedent and his wife signed statements addressed to each of the children, typical of which was the following:

"I am today making a gift of the following securities to H. Harrison Proctor. This gift is not made in anticipation of death, as on December 21, 1933, I took out an insurance policy with the John Hancock Mutual Life Insurance Company, their doctor a few days before having examined me and pronounced me in absolutely first-class physical condition, and on August 1, 1934, I took out another insurance policy with the Mutual Life Insurance Company of New York, their doctor a few days before having pronounced me in absolutely first-class physical condition, but this gift is made in order to reduce my income taxes, and also to give him an independent income which he otherwise would not have:

account. At the time of these gifts, the decedent was on very amicable terms with his children, and very interested in their welfare.

The principal question involved in this controversy is whether or not these 1935 gifts were made in contemplation of death.

After recovering from his illness of 1917, decedent was in excellent health until 1932.

After retiring from business, decedent maintained an office in Boston for the purpose of handling investments and trusts for himself and his family. From 1924 until 1932, it was his practice to go to his office practically every day, sometimes leaving the office before lunch and sometimes not until around three o'clock. During the spring, summer and autumn, he played golf several times a week, often playing 36 holes in a day. During the winter, he curled several times a week.

In January of 1932, decedent visited Dr. Walter Bauer, a specialist in arthritis, with reference to pain and swelling of some of the joints of his little finger. After examination, Dr. Bauer told him that the symptoms in his finger were of no significance. However, he elicited from decedent that he had had fleeting substernal discomfort four or five times in the year or year and a half preceding his visit. On

| | | | |
|---|---|---|---|
| 100 Shs. | American Telephone & Telegraph Co. | No. | QG18428 |
| 300 " | U S & Foreign Securities Corp. pfd. | " | BP150–BP151–BP152 |
| 200 " | Bigelow Sanford Carpet Co. pfd. | " | P37–P38 |
| 250 " | Eastern Gas & Fuel pfd. | " | C1619–C1620–O15050 |
| 100 " | Hygrade Lamp Co. pfd. | " | PC0037 |
| 300 " | Electric Bond & Share pfd. | " | B597–B598–B599 |
| 200 " | Westinghouse Mfg. Co. common | " | NY171351–NY171352 |

"s/ Charles A. Proctor"

physical examination, Dr. Bauer was unable to find any symptoms of any significance. His blood pressure was normal, there was no evidence of hardening of the arteries, and his heart size was at the upper limit of normal. He was a well-developed man of 65, and exceedingly well preserved. Dr. Bauer did say that the substernal symptoms he had had were suggestive of the presence of angina pectoris, and suggested an electrocardiogram and a seven-foot heart plate. The electrocardiogram was normal. The seven-foot heart plate disclosed that the heart was just at the normal limit, but the measurements at the base were considerably increased due to tortuosity of the aorta. Dr. Bauer concluded from the finding plus the symptoms decedent complained of "that they may very well have been mild attacks of angina." Dr. Bauer told him "that as long as a man has symptoms which were suggestive of mild attacks of angina, that I should discuss with him their significance." He likened the symptoms to an alarm clock which should warn him that when they appeared "that he was doing some type of exercise which was more than was good for him. If he would abide by these, that he could prevent them from recurring, and if he did prevent them from recurring, that he stood his best chance of living his natural span of life, which in this case, might have been up to as long as his parents." Dr. Bauer did not make an actual diagnosis of angina pectoris. He told him to cut his golf from 36 holes to 18, not to engage in excessive exercise and not to run for street-cars. He told him that he could continue curling. Dr. Bauer told him that if he followed instructions, he might live 5, 10, 15 or 20 years. He told him that he ought to lead a perfectly normal life with the exceptions already referred to. Decedent visited Dr. Bauer three times in the year 1932, in January, February and March. Dr. Bauer told him to return in 6 months. Decedent did not seem apprehensive or concerned about his condition, but, on the contrary, he seemed relieved to learn that his arthritis was not of the progressive type. He continued to lead a normal life, although he did reduce his golf to 18 holes a day.

After making the gifts in 1935, decedent continued his usual activities, including golf and curling several times a week, and appeared to be in excellent health. He and Mrs. Proctor went on a golfing and motoring trip to Whitefield, N. H., for about ten days. In September, he took an automobile trip to a country club in New Hampshire for several days, with his daughter Frances. They played golf every day, and it did not seem to affect him adversely.

In the Fall of 1935, decedent went South on an automobile trip with his son for ten days, and played golf every day. Decedent appeared very healthy and happy during that trip.

In November or December of 1935, while walking to church with Mrs. Proctor, decedent complained to her of substernal pressure for the first time, telling her that he had better slow down. During the Christmas vacation of 1935, decedent was going bowling one night with his son. While walking to the bowling alleys, decedent said to his son: "Let's go a little slowly. I have to go a little slowly after meals now or sometimes I get a little pressure." His son had never heard him say anything like that before. They went on, bowled a few strings and went home. On an occasion in early December of 1935, he went with his daughter Frances to visit Barbara who lived in an apartment two flights of stairs up from the street. While walking up the stairs her father got out of breath and said, "We better go more slowly."

Decedent returned to Dr. Bauer in January of 1936 for the first time since 1932, with the specific complaint that for the six months previous his joints had been painful and swollen. He still had slight substernal discomfort located between the second, third and fourth interspaces, which decedent described as a slight constriction which came on when he walked fast, particularly on a cold day. He never had anything in the way of true pain, and nothing to suggest true angina. The electrocardiogram this time showed definite coronary heart disease. The laboratory findings were normal except for the heart traces which had changed slightly. Dr. Bauer wrote to decedent warning against undue exercise and overeating. Decedent at the time of the January 1936 visit had no particular concern except for his fingers. Decedent continued to curl. He told both his secretary and Mrs. Proctor about his visit to Dr. Bauer and that he had to go more slowly, but that he could curl once a day. Decedent curled up in Montreal once a day for three days beginning the first of February. He returned, still apparently in good health. Decedent died suddenly in his home the following Sat-

urday, February 8, 1936, of coronary thrombosis. He had gone to the Symphony with his daughter, Barbara, the day before his death. He was talking on the telephone with Barbara on the morning of his death, and made a luncheon engagement with her for the next day. H. Harrison Proctor was named executor of his father's will and successor trustee of the 1919 and 1924 trusts. However, decedent had never familiarized his son with the affairs of the trusts or with his own estate.

At the time of his death, decedent held a four-year mortgage note from Grace F. Cole and Charles H. Cole, dated July 1, 1932, and due July 1, 1936, secured by real estate with a fair market value of $6,525.-79. A $16,250 balance was due on the note, together with taxes on the mortgage property which had been advanced by the decedent, $2,478.85, and interest in arrears at the date of death, $2,034, or a total of $20,762.85. In their return, the executors valued the note at $6,525.79. The Commissioner proposed to increase the gross estate in the amount of $14,237.06 by including therein the note at a value of $20,-762.85. Charles H. Cole told the decedent before he died that he and Grace F. Cole, his wife, could not pay the note and offered to allow the decedent to take the house which was security for the note. After decedent's death, Cole said the same thing to the executors, and made the same offer to them. Cole made some payments, but they amounted to payment of only part of the interest. Thus the indebtedness on the note continually increased. The executors have agreed to reduce the note to $6,700. I find that the Coles were at the time of decedent's death unable to pay the note, and were unable thereafter to pay the note. I find that there was no reasonable expectation at the time of decedent's death or thereafter that the Coles would ever be able to pay the amount due on the note.

Edward C. Thayer, Esquire, of the law firm of Rackemann, Sawyer and Brewster, has done a great deal of work with reference to proceedings to recover alleged overpayment of taxes. Mr. Thayer and H. Harrison Proctor, executor, agreed that the firm of Rackemann, Sawyer and Brewster should receive a $25,000 fee in the event that the plaintiffs in this case were successful in recovering the alleged overpayment. In the event that they were unsuccessful, the charge would be less. There was no agreement as to how much less the fee would be in the event that the plaintiffs were unsuccessful.

The parties, by written stipulation, agreed to the following facts:

"The executors on their estate tax return disclosed, for information but not for tax, the gifts made by the decedent for the benefit of his children under the trusts of 1919, the trusts made for the benefit of his children in 1924, the gifts made to his children on August 8, 1935, and also the gifts made to his wife, Mrs. Grace H. Proctor, on October 16, 1931, and May 28, 1932.

"Upon audit of said return, the Commissioner of Internal Revenue, by letter dated December 21, 1937, proposed to determine a deficiency of $544,539.35 in estate tax liability, based principally upon the inclusion of decedent's contributions to said trusts of December 26, 1919 at a value of $510,489.17, his contributions to said trusts of December 10, 1924 at a value of $369,-693.10, said gifts made August 8, 1935 at a value of $375,731.25, and the gifts made to Mrs. Proctor in 1931 and 1932 at an aggregate value of $135,018.58.

"The Commissioner in said letter also proposed to make certain adjustments in asset values and certain other additions to the gross estate which are not complained of, and to disallow a very large number of relatively small deductions from Miscellaneous Administration Expense and Debts of the Decedent which had been claimed as deductions by the executors upon the return.

"The executors duly filed their protest, dated February 10, 1938, against the adjustments proposed by the Commissioner in said letter of December 21, 1937, and a conference was held upon said protest in Washington, D. C. on March 10, 1938, at which the executors were represented by Samuel Freedman, Esquire. Thereafter, in a letter dated March 30, 1938, the Commissioner of Internal Revenue proposed to determine a revised deficiency in the amount of $137,681.24, resulting from the elimination from the gross estate of the contributions to the trusts of December 26, 1919 and to the trusts of December 10, 1924 and of the gifts to decedent's wife on October 16, 1931 and May 28, 1932, and upon no other adjustments. Said letter explained that the net deficiency, after allowing credit for State, estate and inheritance, legacy and succession taxes, would be $120,507.96, and enclosed Form 890 of the Treasury Department, waiving restrictions upon and consenting to the assessment and collection of a deficiency in estate tax in

the amount of $120.507.96, together with interest thereon as provided by law, and requested that said form be executed and returned. Said form was executed by the executors, or one of them, and returned to the Bureau of Internal Revenue, whereupon a deficiency tax in the amount of $120,507.96, together with interest thereon of $7,103.37, or a total amount of $127,611.33, was assessed and paid on June 9, 1938 to the defendant in his capacity as Acting Collector of Internal Revenue at Boston.

"Form 890, as executed, was as follows:

" 'Waiver of Restrictions against Immediate Assessment and Collection of Deficiency in Estate Tax

" 'MT–ET–C1–12765

" 'District of Massachusetts

" 'Pursuant to the provisions of section 308(d) of the Revenue Act of 1926, the undersigned executor or administrator of the estate of Charles Anderson Proctor waives the restrictions provided in section 308(a) of the Revenue Act of 1926, and consents to the assessment and collection of a deficiency in estate tax in the sum of $120,507.96, together with interest thereon as provided by law.

" 'Assess DTF. Tax $120507.96

" 'Assess INT 6% From 5–8–37 to 5–5–38

" 'Date 4–28–38

" 's/ Henry Harrison Proctor
　　　(Executor or administrator)
　　　　24 Milk Street, Boston

" 'Date—April 2, 1938

" 'Note—This waiver does not extend the statute of limitations for refund or assessment of tax, and is not an agreement as provided under section 606 of the Revenue Act of 1928. The submission of the waiver will not prejudice the right to file a claim for refund of any portion of the tax, but will expedite the settlement of the case and will reduce the accumulation of interest, as the regular interest period terminates 30 days after the filing of the waiver or on the date of assessment, whichever is earlier.'

"No closing agreement under the Internal Revenue Code, section 3760, 26 U.S.C.A. Int.Rev.Code § 3760, was entered into between the executors and the Commissioner and approved by the Secretary of the Treasury or the Under-secretary or an Assistant Secretary.

"The value of the real estate at 34 Gloucester Street, Boston, Massachusetts, securing the mortgage note of Grace F. Cole and Charles H. Cole, dated July 1, 1932, and due July 1, 1936, was $6,525.79.

"On April 6, 1938, the executors paid Samuel Freedman, Esq., 199 Washington Street, Boston, Massachusetts, $7,500 for services rendered by him to the Estate in connection with preparing and filing protest against the deficiency proposed in letter of the Commissioner dated December 21, 1937 and attending the conference on such protest at Washington on March 10, 1938, and on January 20, 1938, paid him $75, and on June 7, 1938, paid him $75 in reimbursement of expenses incurred in connection with said matter.

"Subsequent to filing the return, the executors made the following expenditures:

| | |
|---|---:|
| Twelve certificates of Executors' appointment. | $ 6.00 |
| Transfer stamps, postage and insurance in connection with the transfer of securities. | 428.43 |
| Salary of Isabelle M. Hodgkins, Melrose, Massachusetts, for clerical services to the Executors from February 8 to December 31, 1936, at $40 week. | 1,880.00 |
| Compensation paid to Robert P. Lyle, 10 Post Office Square, Boston, Massachusetts, for accounting services. | 1,000.00 |
| Total | $3,314.43 |

"The foregoing payments have not been allowed as deductions.

"The executors have also made the following payments, none of which have been allowed as deductions:

| | | |
|---|---:|---:|
| Wages of servants for one week following the date of death: | | |
| Amanda Anderson | $14.00 | |
| Jemima McDonald | 14.00 | |
| Bertha Frye | 14.00 | |
| Charles Drago | 24.00 | |
| Elizabeth Waldie | 10.00 | $76.00 |
| Additional Federal income tax, paid December 9, 1937, for 1935 | | 188.12 |
| Pledge to Community Federation of Boston in consideration of the services rendered the community by the participating agencies and the gifts of others, for year 1935, paid by Executors April 9, 1936 | | 1,400.00 |
| Total | | $1,664.12" |

The complaint in the present action was filed on July 31, 1941.

At the trial it was stipulated that the following deductions from the gross estate, which have been claimed by the executors but disallowed by the Commissioner of Internal Revenue, are proper and are to be allowed in computing the judgment, viz.:

| | |
|---|---|
| Attorney's fees paid Samuel Freedman. | $7,550.00 |
| 12 Certificates of Executors' Appointment. | 6.00 |
| Transfer stamps, postage and insurance in connection with transfer of securities. | 428.43 |
| Salary of Isabel M. Hutchins for clerical services to executors from Feb. 8 to Dec. 31, 1936. | 600.00 |
| Fee for accounting services paid Robert P. Lyle. | 1,000.00 |
| Wages of servants for one week following date of death, in the aggregate. | 76.00 |
| Additional Federal income tax paid Dec. 9, 1937 for 1935. | 188.12 |
| Pledge to Community Federation of Boston for the year 1935, paid by executors April 9, 1936. | 1,400.00 |
| Total | $11,248.55 |

## Discussion

Thus the only issues remaining are three:

1. Was the action of the Commissioner in including in the gross estate the gifts made to the children in 1935 erroneous?

2. Was the action of the Commissioner in including in the gross estate the Cole note at a value of $20,762.85 erroneous?

3. Was the action of the Commissioner in disallowing the deduction of $25,000 for attorneys' fees of Rackemann, Sawyer and Brewster erroneous?

■ 1. The only question involved in the first issue is whether or not the gifts to the children in 1935 were made in contemplation of death. If they were so made, then they are a part of decedent's estate for purposes of taxation, and the plaintiffs cannot prevail. If they were not made in contemplation of death they are not to be included in decedent's gross estate for purposes of taxation. Section 302(c) of the Revenue Act of 1926, 26 U.S.C.A. Int.Rev.Acts, page 227. In or-

der to constitute a transfer in contemplation of death it is not necessary that the donor fear that death is close at hand. However, the contemplation of death must be an impelling cause and controlling motive, in order to render the transfer one made in contemplation of death within the meaning of the statute. In the instant case, decedent, at the time of the gifts in question, was a man apparently in excellent health for one of his years. He engaged several times a week in golf or curling. He was of a happy and cheerful disposition. In 1932, he had been warned that he had certain symptoms suggestive of angina pectoris. It was not, however, until 1936, after the gifts were made, that he learned that he had a serious coronary condition. I am of the opinion that he expected to live many years longer.

The government argues that his action in taking out the combination policies in 1933 and 1934 is evidence that he contemplated death and wished to reduce his gross estate by $40,000. This argument would seem inconsistent with the fact that after taking out the combination policies he took out two single premium straight annuity policies in two different companies other than those issuing the combination policies, in the amount of $25,000 each. Thus, if it is true, as contended by the government, that his purpose in taking out the combination policies was to reduce his estate by $40,000, it would seem entirely inconsistent for him to invest $50,000 in the annuity policies with little expectation of ever realizing the amount of his investment.

■ He did not in any way act as one who felt that death was near. Golf and curling involve rather strenuous exercise, and it seems improbable that one who fears that death from heart disease is imminent would engage in such strenuous exercise. Both before and after the gifts were made, he golfed, curled, bowled, walked, went on long motor trips, and acted in every way as one would who felt he was in good physical condition. Of course, death need not be imminent, nor need the person who makes the transfer fear that it is imminent, in order to render the transfer one made in contemplation of death. However, as was said in United States v. Wells, 283 U.S. 102, 117, 51 S.Ct. 446, 451, 75 L.Ed. 867: "As a condition of body and mind that naturally gives rise

to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or nonexistence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death." Considering the decedent's disposition, activities and mode of life, which changed but little in the last several years of his life, it seems quite clear that the decedent entertained little thought of approaching death.

■■■ Beginning with the establishment of the 1919 trusts, decedent followed a policy of granting to his children, of whom he was very fond, and with whom he was on very affectionate terms, property from which they could derive income. In 1919 and 1924, he and his wife established substantial trusts for the children. The decedent thought that a man in his financial position should make provision for the distribution of his property among his family. He has always been very liberal with the children. At the time he made the gifts in question, one of his daughters was married to a young surgeon who had little prospect of obtaining any substantial income in his profession for some time. Decedent also believed that the gift tax rate would be higher very shortly. Decedent also desired to lower his own income in order that his income tax would be less. He felt that his children had proved themselves responsible and that it was time to give them some income of their own. In view of all of the evidence, I am of the opinion that the controlling motive and impelling cause of the transfers were a desire on the part of the decedent to lower his income tax and to grant to his children independent property and independent income. These gifts, of course, were made within two years of decedent's death, and there is a statutory presumption that transfers made within two years of death are made in contemplation of death. Section 302 (c) of the Revenue Act of 1926. However, this is a rebuttable presumption, and I am of the opinion that the plaintiffs have sustained the burden, not only of rebutting this presumption, but of establishing by an overwhelming weight of the evidence that these gifts were not made in contemplation of death.

The government has argued that the statement by the decedent in the memoranda accompanying the gifts, "This gift is not made in anticipation of death", indicates that decedent had estate taxes in mind. There is no question that the decedent had in mind estate taxes. He was a lawyer himself. He undoubtedly was familiar with the case of United States v. Wells, supra. However, the avoidance of estate taxes was not a compelling motive in the making of the gifts.

■ 2. I am of the opinion that the Commissioner erred in including the Cole mortgage note at its face value. It seems quite apparent that the fair market value of the note was the value of the real estate securing the note, namely, $6,525.79.

■ 3. The last question is whether or not the plaintiffs are entitled to a deduction of $25,000 for attorneys' fees. There was no agreement as to what the fee would be in the event that the plaintiffs lost the case. Consequently, there was no basis on which the Commissioner could have allowed a deduction. The Commissioner could not have reasonably expected that the fee of $25,000 would be paid. In fact, the Commissioner felt that the plaintiffs should not prevail in this case, as is apparent from his decision.

### Ultimate Findings

1. Contemplation of death was not an impelling motive for the 1935 gifts.

2. The fair market value of the Cole note at decedent's death was $6,525.79.

3. At the time that the Commissioner disallowed the deduction of Rackemann, Sawyer and Brewster, the Commissioner could not have reasonably expected that the fee of $25,000 would be paid.

### Conclusions of Law

1. The 1935 gifts were not made in contemplation of death within the meaning of Section 302 of the Revenue Act of 1926, and consequently should not have been included in the gross estate by the Commissioner.

2. The plaintiffs are entitled to recover the amount paid as additional taxes as a result of the increasing of the gross estate by including therein the value of the 1935 gifts.

3. The Commissioner erred in including in the gross estate the Cole note and mortgage obligation at a value greater than $6,525.79.

4. The plaintiffs are entitled to recover the amount paid as additional taxes as a result of valuing the Cole note and mortgage obligation at $20,762 instead of $6,525.79.

5. The Commissioner did not err in refusing to allow a deduction of $25,000 for attorneys' fees.

6. By agreement, the plaintiffs are entitled to recover the amount paid as additional taxes as a result of the Commissioner's disallowing the following deductions:

| | |
|---|---:|
| Attorney's fees paid Samuel Freedman. | $7,550.00 |
| 12 Certificates of Executors' Appointment. | 6.00 |
| Transfer stamps, postage and insurance in connection with transfer of securities. | 428.43 |
| Salary of Isabel M. Hutchins for clerical services to executors from Feb. 8 to Dec. 31, 1936. | 600.00 |
| Fee for accounting services paid Robert P. Lyle. | 1,000.00 |
| Wages of servants for one week following date of death, in the aggregate. | 76.00 |
| Additional Federal income tax paid Dec. 9, 1937 for 1935. | 188.12 |
| Pledge to Community Federation of Boston for the year 1935, paid by executors April 9, 1936. | 1,400.00 |
| Total | $11,248.55 |

The plaintiffs shall draw an order in conformity with this Memorandum.