275 P.2d 843 (1954)
In re WARREN'S ESTATE.
STATE
v.
WARREN.
No. 9233.
Supreme Court of Montana.
Submitted March 19, 1954.
July 30, 1954.
Rehearing Denied November 9, 1954.
Arnold H. Olsen, Atty. Gen., William F. Crowley, Asst. Atty. Gen., Mr. H. O. Vralsted, Chief Tax Counsel for Bd. of Equalization, Helena, Lyman J. Hall, Asst. Tax Counsel for Bd. of Equalization, Helena, H. O. Vralsted, Helena, argued orally, for appellant.
Wood, Cooke & Moulton, William H. Bellingham, B.E. Longo, Billings, B. E. Longo, Fredric C. Moulton, Billings, argued orally, for respondent.
ANGSTMAN, Justice.
Floyd Warren died testate on October 7, 1950, at his residence in Big Horn County, where he left an estate consisting principally of stock in Floyd Warren, Inc., a Montana corporation. He left surviving him his wife, Maud V. Warren, three sons, Wallace C., Darroll and Robert C. Warren, and a daughter, Bonnie Beary.
The will was executed on October 3, 1949, when testator was 59 years of age. By the terms of the will all of the property of testator was devised and bequeathed to his wife. Paragraph III of the will was as follows: *844 "In making disposition of my property as aforesaid I have intentionally omitted to provide for my beloved children, Wallace C. Warren, Darroll Warren, Robert C. Warren, and Bonnie Beary, as I have already made certain provisions for said children and I also rest secure in the belief that my wife, out of the property devised and bequeath[ed] to her hereunder, will make adequate provisions for them.
The corporation, Floyd Warren, Inc., was organized on December 1, 1948. Testator at that time transferred most of his property consisting principally of 3,200 acres of land with improvements, to the corporation. The capital stock of the corporation was divided into 3,000 shares of the par value of $100 per share; 1,443 shares were issued on December 1, 1948, to testator, 599 to his wife Maud and 82 shares to Darroll for a car and truck. On December 10, 1948, decedent transferred to his children the following stock: To Darrol 120 shares; to Bobbie 119 1/2 shares; to Bonnie 119 1/2 shares.
This proceeding seeks an adjudication that the shares given to the wife and children, except the 82 shares, were gifts made in contemplation of death and hence are subject to an inheritance tax. A further question is whether an item of $500 for "accounting services" was properly allowable as a deduction as for an expense of administration.
The district court ruled against the state on both contentions. It found that the gifts "were not made in contemplation of death, were not testamentary in nature, and were not made for the purpose of evading or avoiding the inheritance tax laws of the State of Montana; that the said gifts were made for purposes associated with life rather than with death" and so far as the item for accounting was concerned, that the "services were necessary to the probate of the estate" and that the charge is reasonable: The order of the court fixing the inheritance tax excluded the gifts as a part of the estate of decedent and allowed the deduction of $500 for accounting services. This appeal is from the order so determing the inheritance tax.
The case turns upon the question whether the findings of the court are sustained by substantial evidence. If thus sustained the order of the court must be upheld. Mahoney v. Lester, 118 Mont. 551, 168 Pac. (2d) 339.
Our statute provides for the taxation of transfers or gifts made in contemplation of death and that all transfers or gifts made within three years prior to the death of the grantor or donor of a material part of his estate shall, "unless shown to the contrary be deemed to have been made in contemplation of death". R.C.M. 1947, sec. 91-4402.
In the case of the In re Wadsworth Estate, 92 Mont. 135, 11 Pac. (2d) 788, this court approved the rules announced in United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867, which should be applied in a given case to determine whether or not a gift was made in contemplation of death. No useful purpose would be served in repeating what was there said. Generally speaking, the test to be applied is to ascertain the dominent motive of the donor in the light of his bodily and mental condition, and "the best evidence of the decedent's state of mind at the time and his reasons for making the transfers are the statements and expressions of the decedent himself." To the same effect is In re McAnelly's Estate, Mont., 258 Pac. (2d) 741.
"Where the motivating cause for the transfer is something other than the transferrer's contemplation of his death, be such cause laudable or otherwise, the statute can have no application, and the transferred property may not be included for taxation in the transferrer's gross estate." Note in 120 A.L.R. 171.
In United States v. Wells, supra [283 U.S. 102, 51 S.Ct. 452], the court observed: "The purposes which may be served by gifts are of great variety. It is common knowledge that a frequent inducement is not only the desire to be relieved of responsibilities, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration *845 of that event. There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death. * * * In the view of the court as thus explicitly stated, not only was there no fear at the time of the transfers that death was near at hand, but the motive for the transfers brought them within the category of those which, as described by the Government, are intended by the donor `to accomplish some purpose desirable to him if he continues to live.'"
In 1941 Floyd Warren "had a slight pain in his heart or in his chest" and his brother took him to a doctor, a heart specialist at Billings, who gave him some medicine or pills and told him, "there wasn't anything basically wrong with him" and that if he would "kind of slow down a little bit he would live to be an old man." He continued his farming activities without change and died of coronary occlusion. He had never been confined to bed with an illness except that he at one time had a hernia operation. During the year 1948 he was "in very good health" and worked hard. During the farming operations, beginning in the early forties, decedent found it difficult to employ labor with which to operate the farm.
Darroll Warren testified: "Q. What was the agreement between you and your father? A. The agreement was that if I stayed with him and worked for the outfit that eventually it would  he would turn it over to me and he would more or less retire." The witness went to California in 1935 and then came back in 1937 and worked until 1941. He then worked for Harve Willcutt, Jr. His father asked him to come back to the ranch and stated that if he "would come back and work and after approximately ten years, why I would have a share in the outfit and together we would build it up." He accepted the promise. He said the whole family worked on the ranch; that "it was more or less a family affair." Bonnie Warren married Donald Beary who was a machinist and mechanic by trade. When the ranch property was acquired by deceased there was machinery and a machine shop on the place. His father had no man competent to run the machine shop and he asked the witness to persuade Donald Beary to give up his employment with the Ryan Aircraft Company in San Diego, California, and take over as machinist on the ranch. The witness promised to give Bonnie an interest in the ranch if he would work for them on the ranch. This he did.
Wallace went it alone and chose not to join the family enterprise. The mother of Darroll Warren also worked on the ranch  cooking for as many as 20 men and helped with the regular farm work. Bobbie is also working on the ranch. Darroll testified that his father did not have the capital with which to hire help comparable to that in the family. Members of the family were to have shares in the corporation when it was formed. It was to be operated as a family unit.
Maurice Colberg, a certified public accountant, testified that he did some work for Floyd Warren and was told by Warren why he wanted to form a corporation. He said: "Well, as I recall it, Floyd Warren stated that if he could get title to the property which was in Warren & Sons, at that time, which was, this was shortly after 1947 or around the 1st of the year of 1948 that I am speaking about, that if he could get title to that property he would like to have it incorporated so that he would have a unit, a family unit in which the family could have an interest and there was discussions back and forth as to possibility of saving income taxes and it would give him a unit that he would have together and which he could have as a family farming unit."
Mr. Fred Moulton who organized the corporation likewise testified substantially to the same effect as to the purposes of the corporation as stated to him by Floyd Warren. He also drew the will for Warren advising him that he should make a will, and this was done at a time when his wife was entering the hospital for an operation, and the two wills were made simultaneously.
The foregoing evidence was ample to justify the conclusion of the court that the gifts were not made in contemplation *846 of death but for purposes associated with life.
Courts have reached the same result where the evidence was stronger in support of the state's contention than in this case. See Heiner v. Donnan, 3 Cir., 61 F. (2d) 113; Greer v. Glenn, D.C., 64 F. Supp. 1002; Proctor v. Hassett, D.C., 52 F. Supp. 12; Clarke v. United States, D.C., 5 F. Supp. 292; Squier v. Martin, 131 N.J. Eq. 263, 24 A. (2d) 865. And compare In re Lambourne's Estate, 97 Utah 393, 93 Pac. (2d) 475, and Allen v. Trust Co., 326 U.S. 630, 66 S.Ct. 389, 90 L.Ed. 367.
The facts in the case in In re Daniels' Will, 225 Wis. 502, 274 N.W. 435, were very similar to those here. There, as here, the gifts consisted of stock in a corporation organized by the donor. The proof showed that he gave stock to his son with the idea of keeping "his son at home" and interested in his business. In that case the gift was made more than two years before the death of the donor but that merely deprived the state of the presumption and affected the burden of proof. The court sustained the judgment of the lower court finding that the gift was not made in contemplation of death. To the same effect is In re Wimpfheimer's Estate, 126 N.J.L. 502, 20 A. (2d) 433, where the purpose of the gift was to stimulate the interest of the donor's sons in his business.
The only other question in the case is whether the court erred in allowing the deduction of $500 as an expense of administration. The statute, R.C.M. 1947, sec. 91-4407, allows, among other deductions, "the ordinary expenses of administration, including the commissions and fees of executors and administrators and their attorneys actually allowed and paid". The state contends that his claim had not been allowed or paid and that it was not an ordinary expense of administration within the meaning of the statute.
The court did not err in holding that this item was an ordinary expense in the administration of the estate. The appraised value of the estate was $159,679.40 represented mainly by stock in the family corporation. The accountant made an audit to ascertain the book value of the assets and stock since the stock had no market value. He prepared the information for the federal estate tax return and the valuation for state tax purposes. While ordinarily the appraisers are the ones who fix the value of the property of an estate, where as here, the estate consists of stock in a closely held corporation, the services of an accountant may become necessary to determine the fair market value of the stock.
As to the contention made by the state that the claim was never allowed or paid, it is sufficient to say that the statute does not make this a condition precedent to the allowance of a claim for the ordinary expenses of administration. The requirement in the statute relied on by the state relates only to "commissions and fees of executors and administrators and their attorneys." The words "actually allowed and paid" as used in the statute do not relate to the ordinary expenses of administration.
The order appealed from is affirmed.
MR. JUSTICES FREEBOURN, and ANDERSON concur.
MR. CHIEF JUSTICE ADAIR and MR. JUSTICE BOTTOMLY.
We dissent, reserving the right to later file herein our opinion setting forth the facts and reasons for such dissent.